CITIZENS FIDELITY BANK & TRUST
CO., a Corporation, et al., Appellants,

v.

W. P. CURLIN, Commissioner of Highways,
et al., Appellees.

Court of Appeals of Kentucky.

June 24, 1955.

Samuel Greenebaum, Bullitt, Dawson & Tarrant, Louisville, for appellants.

Lawrence G. Duncan, County Atty., J. W. Jones, Asst. County Atty., Robert T. Burke, Jr., Thomas J. Wood, Louisville, for appellees.

CULLEN, Commissioner.

The main controversy presented on this appeal concerns a portion of the right of way occupied by U. S. Highway No. 60 in front of Oxmoor Farm a short distance east of Louisville. A subordinate controversy concerns the right of way for the Inner Belt Highway at the point where it intersects U. S. Highway No. 60 from the southwest. Both controversies arise out of the fact that neither the State of Kentucky nor Jefferson County acquired any written title or written easement from the owners of Oxmoor Farm at the time U. S. Highway No. 60 was widened and reconstructed in 1937.

Oxmoor Farm consists of two parcels, one of which is owned by the Citizens Fidelity Bank and Trust Company as trustee under the will of Annie L. Bullitt, and the other of which is owned by William Marshall Bullitt and wife. As owners, they brought this action against the Commissioner of Highways of Kentucky, Jefferson County and various of its officials, and several highway contracting firms, seeking a declaration of rights, damages for wrongful occupancy, damages for the value of the land occupied, and an injunction against various acts, including use of the highway until compensation be paid.

The circuit court, after voluminous evidence was taken, entered judgment declaring in effect that the county was entitled to the right of way but was indebted to the plaintiffs in the sum of $3,530, plus interest from April 5, 1937, under an agreement pursuant to which the plaintiffs had agreed to accept that sum for the land. The plaintiffs were held entitled to no other relief, but so much of their complaint as sought damages for interference with their access to the highway, at the point of intersection with the Inner Belt Highway, was dismissed without prejudice.

The plaintiffs have appealed, contending that the court erred in holding that there was a binding agreement to accept $3,530 for the land, and in denying them all the relief sought in their complaint. Jefferson County has cross-appealed, maintaining that the plaintiffs are barred by limitations from any recovery. It is the position of the county, as it is of the plaintiffs, that there was no binding agreement to sell the land for $3530; that the county simply appropriated the land in 1937 and the plaintiffs' right to recover for the taking was barred after five years. The county also contends that in no event should it be held liable for interest on the alleged sale price.

A proper understanding of the controversy requires a reference back to 1906. At that time the old Louisville-Shelbyville Turnpike, with a pavement 20 feet wide, ran along the north side of Oxmoor Farm. Subject to the highway easement, the owners of Oxmoor Farm held title to the middle of the turnpike. Between the southern edge of the pavement and a board fence paralleling the highway, there was a grassed area, called by the plaintiffs the "front lawn" of the farm, which was 56 feet wide. In 1907, the owners of Oxmoor Farm conveyed to an electric railway company a right of way easement in a strip of the "front lawn," 30 feet wide, immediately adjoining the board fence. The railway company occupied this strip, and erected a wire fence along the north line of the strip, leaving a grass plot 26 feet wide between the wire fence and the turnpike pavement. In 1934 the railway company abandoned operations, and the 30-foot right of way reverted to the farm. The strip was planted in grass, but the wire fence marking its northern boundary continued to be maintained, so as to leave a 26-foot strip between the wire fence and the turnpike pavement.

In 1934, plans were initiated for widening and reconstructing the old turnpike, which is now U. S. Highway No. 60.

Negotiations were begun with William Marshall Bullitt with the view of acquiring additional right of way in front of Oxmoor Farm. The initial negotiations were unsuccessful and in 1936 a condemnation suit was instituted.

The crux of the controversy arises from the fact that the highway authorities, and the representatives of Jefferson County, *assumed* that the strip 26 feet in width, beween the pavement of the old highway and the wire fence along the north line of the old railway right of way, was part of the right of way of the old highway, which was available for use for the new highway. In the negotiations with Mr. Bullitt prior to the condemnation suit, and in the condemnation suit, the only land sought to be acquired was the 30-foot strip formerly occupied by the electric railway. It was assumed that the acquisition of this strip would result in a right of way for the new highway 76 feet in width from the northern edge of the old pavement to the board fence at the southern edge of the old railway right of way. (Apparently there also was an assumption that there was an existing easement of 24 feet north of the old pavement, because the plans called for a 100-foot right of way for the new highway.)

The condemnation suit was not pursued to judgment, and negotiations were again conducted with Mr. Bullitt early in 1937, with a view to a purchase of the desired land. At a conference on March 30, 1937, between Mr. Bullitt and a representative of the county, Mr. Bullitt made certain statements which the representative of the county interpreted as an offer to sell the old railway right of way for $3,530. However, Mr. Bullitt has a different version of what the offer was. This version is predicated upon what we consider to be an unacceptable premise, which is, that Mr. Bullitt thought the new highway would consist merely of a 30-foot pavement, with no shoulders or adjoining right of way.

Mr. Bullitt states that at the time of the meeting on March 30, 1937, there was an uncertainty as to whether the new highway would consist only of a 10-foot widening of the old pavement, or would consist of a new 30-foot pavement; that he offered in the alternative to sell 10 feet adjoining the old pavement, or to sell the 30-foot railway right of way; and that there were certain conditions attached to the offers, one of which was that no "hot dog stands" should be erected along the new highway. It is his contention, among other things, that no specific agreement was ever reached.

Mr. Bullitt is an intelligent, well-informed man, and is an attorney with years of experience. It is impossible to believe that he thought the new highway would consist only of a 30-foot pavement, and nothing more. His alleged condition that no "hot dog stands" be built along the new highway shows that he knew the highway would have a shoulder area, because he certainly did not imagine that such stands would be erected on the pavement. Furthermore, his alleged alternative offer to sell 10 feet adjoining the old pavement is completely incompatible with the fact he has argued throughout that the highway authorities and county officials assumed that the old highway right of way ran to the wire fence on the south, embracing 26 feet of shoulder area. If this was their assumption, they would have had no interest in buying the 10-foot strip, which they though they already owned.

There are only two reasonable conclusions to be drawn from the evidence concerning the conference of March 30, 1937. One is that Mr. Bullitt agreed to sell the 30-foot railway right of way, intending that this should carry with it the right to use all of the land between it and the old pavement. The other is that he agreed to sell the 30-foot right of way, secretly intending to reserve and retain the land between it and the old pavement, but permitting the highway authorities to proceed in the belief that the land was available for use for the highway, and knowing that the highway authorities intended to use the land for the highway. Under either conclusion we think a dedication would result. Under the first

conclusion, the dedication would result from specific intent. Under the second conclusion, the dedication would result from the fact that the acts of Mr. Bullitt justified the highway authorities in believing that he intended a dedication, and they proceeded to construct the highway in reliance thereon. See 16 Am.Jur., Dedication, sec. 17, pp. 361, 362.

The events that transpired subsequent to the conference of March 30, 1937, strongly support the theory of dedication of the land between the railway right of way and the old pavement. Those events were:

1. On April 5, 1937, the land agent of the county reported to the fiscal court that Mr. Bullitt had agreed to sell the "necessary right of way" for the highway for $3530, and the fiscal court thereupon adopted a resolution "accepting the offer" and directing the issuance of checks to Mr. Bullitt and the trustee of the Annie Bullitt Estate. However, Mr. Bullitt was not informed of the text of the report and resolution, at the time.

2. On April 8, 1937, Mr. Bullitt addressed the following letter to the fiscal court:

"Dear Sirs:
"Although the technical description of the highway right of way in front of my property, running from the 8 Mile House to Beechwood Junction, has not been finally completed and the deed drawn and agreed on by Judge Edwards and myself, as I know you want to do something at this time, this is just to let you know that the State Highway Commission can go ahead and start and conclude any highway work they may want to do, and that I will interpose no objection to the highway construction.
"Very truly yours,
"Wm. Marshall Bullitt"

3. A few days after the above letter was written, the land agent of the county presented to Mr. Bullitt, for execution, a proposed deed for the right of way. Mr. Bul-

litt did not execute the deed for a number of technical reasons, one of which was that the description was so general as to be capable of being construed to convey all of Oxmoor Farm.

4. During the summer of 1937, after the Highway Department had made a survey, and requested a slight relocation of the board fence at the south edge of the old railway right of way, the farm manager of Oxmoor Farm, with Mr. Bullitt's consent, relocated the fence as requested.

5. Beginning in the fall of 1937, the Highway Department proceeded to construct the new highway in front of Oxmoor Farm, completing the work in 1938 or 1939. Mr. Bullitt was in Europe during most of this period. The new highway consisted of two 20-foot lanes, with a 12-foot grass plot between. The south line of the west-bound lane was 24 feet north of the board fence, leaving a 24-foot shoulder.

6. From 1937 to 1951 the Highway Department maintained and operated the new highway, with no complaint from Mr. Bullitt. During this period numerous efforts were made by the county officials to induce Mr. Bullitt to accept the checks for the right of way, and to execute the deed, but Mr. Bullitt kept postponing any action on the basis it was necessary to work out an accurate description of the right of way before a deed could be executed. He wrote several letters during this time, in which he indicated that the only problem was in working out the description for the deed, and in none of which he even remotely suggest that the Highway Department had taken too much land, or that the price had not been agreed upon. In a letter to the Highway Department, on September 27, 1949, he said, among other things:

"For all these years, the Fiscal Court here has had two checks to pay me, one for $1,120, and one for $2420, but it has always delayed delivering them to me until they could get a deed, which I have always been willing to give if I could find somebody in the Highway

Department who could agree with me on the description so as to get a deed executed and delivered."

7. No assertion was made by Mr. Bullitt that the Highway Department was not entitled to use the entire right of way occupied by the new highway, until after a controversy arose in 1951 concerning the right of way for the Inner Belt Highway. This controversy will be discussed at a later point in this opinion.

■ From all of the foregoing facts, we reach the conclusions (1) that Mr. Bullitt agreed to sell the 30-foot right of way of the old electric railway for $3,530, and (2) that he dedicated for highway purposes the land between that right of way and the old pavement. His conduct throughout shows that he knew and understood that all of the land between the old pavement and his board fence would be needed for the new highway, and he was demanding payment only for the south 30 feet, expecting and intending that the balance of the land could be used without compensation.

■ Mr. Bullitt argues that the Highway Department actually took and occupied only the area covered by the westbound pavement, and that he continued to have possession of the grass plot between the two pavements and the grass shoulder on the south. From this he argues no dedication. The argument clearly is without merit, because as a matter of common practicalities, and from the proof, the Highway Department was in actual possession and occupancy of the grass plot and the shoulder.

■ As concerns the agreement to sell the 30-foot right of way, there is no problem of the Statute of Frauds, because the letters exchanged after the oral agreement was made were sufficient to take the agreement out of the statute. See 49 Am.Jur., Statute of Frauds, sec. 316, pp. 630, 631.

■ It is contended by the appellants that Mr. Bullitt had no authority to make a contract to sell land belonging to the An-

nie Bullitt Estate, and certainly no authority to make a dedication of land belonging to that estate. We think it is obvious from the entire record that Mr. Bullitt not only assumed to have, but actually did have, full authority to represent the Annie Bullitt Estate in connection with any disposition of Oxmoor Farm. It is stated in 16 Am.Jur., Dedication, sec. 9, p. 353, that where a dedication is made by one of the joint occupants of land, his authority may be inferred from the absence of any dissent for many years.

■ With respect to the claim of the county, on cross-appeal, that it should not be held liable for interest on the sum of $3,-530 agreed to be paid for the 30-foot right of way, we think the judgment was correct. The county has had the use of the land since 1937, and it appears that a substantial cause of the delay in payment of the money was the county's failure to submit a correct deed for execution, or to meet Mr. Bullitt's demand that an accurate description of the right of way be prepared.

There remains for consideration the controversy concerning the right of way for the Inner Belt Highway. In 1951, Mr. Bullitt and the trustee of the Annie Bullitt Estate executed a deed for this right of way, running across a corner of Oxmoor Farm so as to connect with U. S. Highway No. 60. The description was so drawn as to run to the board fence along the north line of the farm. When the construction work was commenced, and the Highway Department cut through the board fence to connect with U. S. 60, Mr. Bullitt asserted, for the first time, his claim that the south shoulder of U. S. 60 belonged to Oxmoor Farm, and that it was not a part of the highway. The substance of his claim was that the Inner Belt Highway could run to his board fence, but could not cross the shoulder so as to connect with the pavement of U. S. 60. We have disposed of this contention in our holding that the shoulder is part of U. S. 60.

■ In the deed for the right of way for the Inner Belt Highway, certain restric-

tions and conditions were imposed with respect to access from Oxmoor Farm to the Highway. It is claimed by Mr. Bullitt that a culvert, with abutments, erected at the intersection, interferes with this access, and violates the terms of the deed. The circuit court found that there was no interference with any kind of access that presently was desired or that might be desired in the immediate future, and accordingly dismissed the complaint as to this item without prejudice. We think this was a proper disposition of the claim.

The judgment is affirmed on the appeal and on the cross-appeal.

HOGG, J., not sitting.